Judgment rendered July 15, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,969-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

TINA CROW, INDIVIDUALLY                    Plaintiffs-Appellants
AND ON BEHALF OF HER
HUSBAND, ISAAC CROW, JR.

versus

BIOSCRIPT PHARMACY, LLC                    Defendant-Appellee

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Webster, Louisiana
Trial Court No. 82,191

Honorable Douglas Stinson, Judge

* * * * *

TINA CROW                                  In Proper Person,
                                           Appellant

ISAAC CROW, JR.                            In Proper Person,
                                           Appellant

GORDON, REES, SCULLY,                      Counsel for Appellee,
MANSUKHANI, LLP                            Option Care Enterprise
By:  Jay Richard Boltin
     Andrew George Kimball

* * * * *

Before COX, ROBINSON, and HUNTER, JJ.

**ROBINSON, J.**

Tina Crow ("Mrs. Crow") filed a pro se petition for damages in forma pauperis on behalf of her disabled husband, Isaac Crow, Jr. ("Mr. Crow"), (collectively referred to as "the Crows"), on May 12, 2025, against Bioscript Pharmacy, LLC ("Bioscript")[1] alleging personal injury to Mr. Crow related to an overdose of an antibiotic caused by a dosage increase without proper authorization. Mrs. Crow's amended petition filed on May 19, 2025, named Option Care Enterprises, Inc. ("Option Care") as the proper defendant. The Crows allege that Mr. Crow later ratified any pleadings filed by Mrs. Crow.

Mrs. Crow filed a motion for default judgment on July 11, 2025. Option Care filed an exception of prematurity on July 15, asserting the claims warranted the submission to a medical review panel per the Louisiana Medical Malpractice Act ("LMMA"). Mrs. Crow filed an opposition to the exception on July 16. The trial court denied Mrs. Crow's motion for default judgment in an interlocutory ruling on July 28. Following a hearing on October 14, the trial court granted Option Care's exception of prematurity and dismissed the case without prejudice, and a final judgment was entered on November 7. Mrs. Crow appeals.

For the following reasons, we AFFIRM the trial court's judgment granting Option Care's exception of prematurity and dismissing the Crows' case without prejudice.

---

[1]The original petition filed by Mrs. Crow named BioScript Pharmacy, LLC as the defendant. It is uncertain whether the entity was incorrectly identified or simply misspelled, but presumably Mrs. Crow intended to name BioScrip, Inc. as the defendant. However, due to a merger between BioScrip, Inc., and Option Care, the proper defendant is Option Care, as reflected in the amended petition filed May 19, 2025.

**FACTS AND PROCEDURAL HISTORY**

Mr. Crow was involved in a lawn mower accident in which the tip of his right middle finger was severed. He suffered complications from his injury, including gangrene, a bacterial infection, pneumonia, and a cervical abscess in his neck. He received antibiotic treatment via a peripherally inserted central catheter ("PICC line"). Mr. Crow ultimately had surgery on May 29, 2024, to remove the C6 and C7 discs and fuse the C5 and T1 discs. He continued an antibiotic regimen for osteomyelitis following the surgery. He was prescribed a low dose of 500 mg daily of the antibiotic Daptomycin by Dr. Hector Brunet Rodriguez ("Dr. Brunet") on June 6, 2024, among other antibiotics and medications, which was administered through the PICC line by Mrs. Crow during home health treatment. Option Care was the pharmacy that dispensed Mr. Crow's medications.

Mr. Crow was seen by Dr. Alexandre Malek ("Dr. Malek"), an infectious diseases physician, for a follow-up visit on June 20, 2024. He reported some continued episodes of shortness of breath, but the symptoms from his condition were otherwise improving. Dr. Malek ordered the increase of Daptomycin from 500 mg to 750 mg, the recommended dosage for Mr. Crow's body weight.

Option Care's progress notes detail its communications with Mr. Crow's physicians and the Crows. On June 20, 2024, an Option Care pharmacist, Rita Saye ("Ms. Saye"), discussed Mr. Crowe's IV medications with Dr. Malek and the increase of Daptomycin from 500 mg to 750 mg daily. Ms. Saye also discussed the medication increase with Mrs. Crow the same day and explained that a syringe of the smaller 250 mg dose of

2

Daptomycin would be delivered to them in addition to the 500 mg, since they had already received the 500 mg dosage. Then, a full 750 mg syringe would be sent the following week. The additional 250 mg syringe would be delivered the next day, June 21, to be started that evening. On June 21, Ms. Saye confirmed again with Mr. Crowe that he was doing the two back-to-back doses of Daptomycin totaling 750 mg, and he would receive only one 750 mg syringe the next week.

On June 24, Ms. Saye spoke to Mrs. Crow, who reported that Mr. Crow had been feeling sick since receiving the increased dose of Daptomycin. She stated that his muscles were weak, he had no energy, and his mouth had been sore to the point it was difficult to eat. As a result, Mr. Crow stopped the medication on June 23. Mrs. Crow told Ms. Saye that Mr. Crow had his labs done that morning, and Ms. Saye responded that she would let the doctor know about any abnormal results. Mrs. Crow contacted Option Care the same day to let them know that Mr. Crow's lab results showed elevated creatine phosphokinase ("CPK") levels. Ms. Saye stated that she had seen the lab results and had already reached out to the doctor but had not heard back yet. Mrs. Crowe contacted Ms. Saye on June 26 to inform her that Mr. Crow had seen Dr. Brunet for a follow-up visit and was feeling better after lowering the Daptomycin dosage. However, Mrs. Crow notified Ms. Saye on June 28 that Mr. Crow was feeling bad again, and she would be taking him to the emergency room. Mrs. Crow informed Ms. Saye on July 2 that Mr. Crow's lab cultures showed positive results, and she was told by Dr. Brunet to take him to the hospital. There did not appear to be

further communication between the Crows and Option Care past July 2, and there were no progress notes in the record past July 2024.

Mr. Crow went to the emergency room on June 29. At the time of the visit, Mr. Crow's chief complaint was weakness. Mrs. Crow reported to medical personnel that Mr. Crow's antibiotic dosage had been increased by an additional 500 mg, and he started to have body aches, cramps, abdominal pain, and nausea. As a result, he discontinued the additional dosage. Mr. Crow's labs were reviewed by the attending physician, who determined there were no acute findings, and the weakness complained about could be a side effect of the antibiotics. Mr. Crow was discharged with instructions to follow up with the infectious diseases doctor as already scheduled.

Mr. Crow visited the emergency room again on July 2 with concern over his abnormal labs from July 1. Blood cultures that were taken showed candida growth, and there were elevated levels of bilirubin and CPK from the lab dates June 24, June 27, and July 1. The attending physician spoke with Dr. Brunet, who recommended the continuation of 500 mg of Daptomycin and the removal of Mr. Crow's PICC line, which was to be cultured to determine whether it was the source of the candidemia. Mr. Crow was admitted to the hospital for the continued IV treatment and pending CT results to rule out any abscesses. Mr. Crow refused antibiotic treatment following the removal of his PICC line on July 5.

There are no records of further hospitalizations or medical events other than labs dated September 25, 2024, which showed bilirubin levels within normal range, until April 17, 2025, when Mr. Crow went to the Willis Knighton Pierremont emergency room in Shreveport complaining of

4

generalized weakness for the previous week. Mrs. Crow expressed concern that Mr. Crow's high triglycerides were the cause of his symptoms. Mr. Crow was examined but discharged, because his condition was not emergent. It was recommended that he follow up with his primary care physician. Medical personnel indicated that Mrs. Crow was upset at the lack of concern for Mr. Crow's triglyceride levels, specifically noting that Mrs. Crow stated, "So if he goes home and has a stroke, you know what I will do." Mr. Crow went to the emergency room at Houston Methodist The Woodlands the following day, April 18, complaining of slurred speech, right sided numbness, and facial droop. Mr. Crow was examined then discharged following negative CT and MRI scans.

Mr. Crow visited Kelsey Seybold Medical Group in Houston on June 10, 2025, for a consultation, complaining of shortness of breath. He had a chest X-ray done, which was within normal limits. He was referred to otolaryngology for the shortness of breath and hoarseness. However, there is nothing in the record regarding any follow-up visits.

Mrs. Crow alleges that Mr. Crow suffered from heart failure and multiple organ failure as the result of an overdose of Daptomycin, due to an unauthorized increase in the dosage by the Option Care pharmacist. Mrs. Crow also alleges the pharmacist committed fraud by making false representations as to the identity of the prescribing physician, attributing the prescription to Dr. Brunet but then claiming Dr. Malek wrote the prescription and increased the dosage.

Option Care points out that the multiple medical records produced by Mrs. Crow in her filings prove that Dr. Malek ordered an increase in the

5

medication dosage.  It also refers to the finding in the Louisiana Board of Pharmacy's investigative report that the misidentification of the prescriber was "due solely to human error."  Option Care also points out that Mrs. Crow never asserted an identifiable causal relationship between the misidentified prescriber and the alleged overdose or any harm caused.

Mrs. Crow initially submitted a request for a medical review panel in accordance with the LMMA on April 23, 2025, identifying the nature of the malpractice allegations against Option Care as "increasing my husband's IV antibiotic dosage without proper authorization."  However, on May 12, Mrs. Crow filed a pro se petition for damages in forma pauperis on behalf of Mr. Crow against Bioscript, alleging personal injury to Mr. Crow related to an alleged overdose of an antibiotic caused by the increase of dosage without proper authorization.  Mrs. Crow filed an amended petition on May 19, specifically stating that the purpose was "to remove any language implying medical malpractice."  Option Care was also named as the proper defendant, rather than Bioscript.  The petition was served on June 19.

The issue of Mrs. Crow's representation of Mr. Crow was addressed in both appellate briefs.  Mrs. Crow claimed to be authorized to represent her husband in accordance with La. C.C.P. art. 683 and La. C.C. art. 1843.  Option Care asserted that neither statute authorizes such representation because La. C.C.P. art. 683 only allows for the representation of unemancipated minors, not disabled spouses, and La. C.C. art. 1843 allows for the ratification of an obligation that was incurred without prior authorization by the obligee.  However, Option Care stated in its brief that, for the sake of efficiency, it would only directly address the matters raised

by the Crows on appeal and would not further address its claim of Mrs. Crow's unauthorized practice of law.

Mrs. Crow filed several amended and/or supplemental petitions, the fifth being filed on July 7, 2025.  On July 11, she filed her initial motion for default judgment.  Option Care filed an exception of prematurity on July 15, asserting the claims sounded in medical malpractice rather than an intentional tort, warranting the submission to a medical review panel per the LMMA.  Mrs. Crow filed an opposition to the exception of prematurity on July 16, seeking to strike the exception.  Mrs. Crow filed a memo in support of her motion for default judgment the same day, in which she introduced new allegations of wire fraud, mail fraud, and obstruction of justice seeking monetary relief, including pecuniary damages, in the amount of $1.2 billion. This memo acted as a sixth amended petition and second motion for default judgment.  The trial court denied Mrs. Crow's motions for default judgment in an interlocutory ruling on July 28.

Mrs. Crow filed a motion to reconsider default denial with request for written reasons and other relief on July 29, 2025.  The trial court responded the same day with written reasons denying again the motions for default judgment.

Also on July 29, Mrs. Crow filed an additional opposition to Option Care's exception of prematurity, again asking the court to strike the exception as well as asking the court to confirm the motions for default judgment that had already been denied twice.  The court denied the motions to strike Option Care's exception of prematurity and the additional motion for default judgment on July 30.

Option Care filed exceptions of nonconformity, vagueness, and ambiguity on August 7, 2025. On August 8, Mrs. Crow filed a motion to strike the exceptions. The same day, she applied for supervisory writ on the denial of her motions for default, which the court summarily denied on August 29.

Also on August 29, Mrs. Crow filed a third motion to strike Option Care's exception of prematurity along with an additional written request for default judgment. The court denied both motions in an interlocutory ruling in open court at a hearing on September 2, as well as Mrs. Crow's oral request for default judgment during the hearing and followed up with a written denial the same day.

Following a hearing on October 14, 2025, the trial court granted Option Care's exception of prematurity and dismissed the case without prejudice. The court noted that the dismissal resulted in Option Care's additional exceptions of nonconformity, vagueness, and ambiguity, being rendered moot. A final judgment was entered on November 7, which Mrs. Crow appeals.

## DISCUSSION

### *Timeliness of Option Care's Exception of Prematurity*

Mrs. Crow argues that Option Care's exception of prematurity filed on July 15, 2025, was untimely because it did not file an answer within the 21-day answer delay required by La. C.C.P. art. 1001, a deadline of July 10, and no leave of court was obtained for the filing. She argues, therefore, that Option Care's ability to file the exception was waived by operation of law pursuant to La. C.C.P. art. 928, which mandates that dilatory exceptions

8

"shall be pleaded prior to or in the answer." She further argues that the trial court effectively excused Option Care's noncompliance and circumvented default procedure mandated by La. C.C.P. art. 1702 by accepting and acting on the untimely exception while her default motions were pending.

Option Care asserts that the exception was timely filed and it barred further pursuit by Mrs. Crow of a default judgment. It refers to La. C.C.P. art. 1151, which provides, in part:

> A defendant shall plead in response to an amended petition within the time remaining for pleading to the original pleading or within ten days after service of the amended petition, which period is longer, unless the time is extended under Article 1001.

It points out that the exception was filed within eight days of Mrs. Crow's fifth amended petition filed on July 7, 2025. It also refers to La. C.C.P. art. 1002, which provides in relevant part:

> Notwithstanding the provisions of Article 1001, the defendant may file his answer or other pleading at any time prior to the signing of a default judgment against him.

It further refers to La. C.C.P. art. 852, which defines the term "pleading":

> The pleadings allowed in civil actions … shall be in writing and shall consist of petitions, exceptions, written motions, and answers.

Option Care also cites the Third Circuit's holding in *Deville v. Orleans Oil Co. of Lafayette, La.*, 454 So. 2d 420 (La. App. 3 Cir. 1984), that the filing of a declinatory exception extends the time allowed for a defendant to answer until after the disposition of the exception, and that when no such disposition has been made, the time allowed for answering has not elapsed and no default judgment may be entered. The Second Circuit in *Hicks v. Steve R. Reich, Inc.*, 38,424 (La. App. 2 Cir. 5/12/04), 873 So. 2d 849, agreed with the rationale and followed the holding in *Deville*.

9

Mrs. Crow amended her pleadings multiple times. Option Care was within the requisite delay for filing an exception based on the date the amended pleading was filed. It is clear from statutory and case law that Option Care timely filed its exception of prematurity; therefore, the trial court did not err in sustaining the exception.

***Trial Court Rulings on Mrs. Crow's Motions for Default Judgment***

Mrs. Crow claims that the trial court's rulings on her motions for default judgment did not constitute valid judgments, because the court only included handwritten notations of "denied" on the proposed judgments rather than signing actual judgments pursuant to La. C.C.P. art. 1918. She argues, therefore, that the motions remain legally pending and unresolved. She claims that the proper remedy is vacatur and remand with instructions to rule on the default motions by signed judgments as the law requires, citing *Howery v. Linton*, 452 So. 2d 295 (La. App. 2 Cir. 1984).

Option Care points out that the court did provide written denials for the first five motions for default judgment. Nonetheless, it argues that the denial of a default judgment is interlocutory in nature and not final; therefore, a ruling related to such denial is not a "final judgment" requiring conformity to La. C.C.P. art. 1918. Option Care further notes that Mrs. Crow sought a supervisory writ with this Court on the trial court's first four rulings denying default judgment, which was denied on August 29, 2025. Mrs. Crow filed the fifth written request for default the same day. The trial court orally denied the motion at the September 2, 2025, hearing and issued a written ruling the next day. During that hearing, the court denied a sixth oral request for default, stating that it would deny any additional motions,

10

because Option Care had timely filed an exception and Mrs. Crow failed to make a *prima facie* showing that default was warranted. Mrs. Crow did not request written reasons for the denial of the fifth and sixth requests for default.

A judgment that determines the merits in whole or in part is a final judgment. La. C.C.P. art. 1841. A judgment that denies a confirmation of a preliminary default does not determine the merits and is therefore interlocutory. *Gorman v. Miller*, 12-412 (La. App. 1 Cir. 11/13/13), 136 So. 3d 834, *writ denied*, 13-2909 (La. 3/21/14), 135 So. 3d 620; *R & R Steel Erectors v. Watson*, 01-1322 (La. App. 3 Cir. 3/6/02), 809 So. 2d 1228. The refusal to confirm a default judgment is not by itself a final judgment because the plaintiff's claims are not rejected. *Maple Avenue Rental Properties, LLC v. Sylvester*, 23-464 (La. App. 3 Cir. 2/7/24), 380 So. 3d 154; *R & R Steel*, *supra*; *Deville v. Carmouche*, 450 So. 2d 24 (La. App. 3 Cir. 1984); *McElwee v. McElwee*, 256 So. 2d 477 (La. App. 2 Cir. 1972). An interlocutory judgment merely evidenced by a minute entry is not appealable unless irreparable injury can be proved by the appellant. *Veillon v. Veillon*, 497 So. 2d 1087 (La. App. 3 Cir. 1986). Since no substantive issue of merit has been disposed of by an interlocutory order, no irreparable injury can befall the plaintiff. *Id*.

Because the trial court's denials of the default judgment were interlocutory rulings with no determination on the merits, they were not appealable as final judgments. The trial court's denials of default judgment were all in writing, although there is no requirement that the rulings be executed in conformity with La. C.C.P. art. 1918, since it pertains only to the

11

form requirements of final judgments.  This Court has also reviewed the *Howery* case cited by Mrs. Crow and sees no relevance to the issue of form requirements for the trial court's rulings denying the default judgments.

***Trial Court Ruling on Mrs. Crow's August 18, 2025, Motion to Strike***

Mrs. Crow claims the trial court never ruled on her August 18, 2025, filing of a motion to strike Option Care's alleged "untimely exception." However, she does not specifically state which exception, only the motion filed that particular date.  She claims that the court's silence on the motion allowed an exception, which should have been waived by operation of law, to proceed to a hearing and ultimate dismissal of her petition.

Option Care first asserts that Mrs. Crow's brief mistakenly implies that the motion to strike she refers to, claiming it was not ruled upon, was a motion to strike the exception of prematurity.  It states that the motion to strike that Mrs. Crow refers to in her brief is actually pertaining to Option Care's exception of nonconformity, vagueness, and ambiguity.  It notes that Mrs. Crow's first motion to strike was filed on July 16, 2025, by way of an opposition to the exception of prematurity, in which Mrs. Crow prayed, but did not move, to strike the exception, and she did not include a proposed order.  Then, Mrs. Crow filed a motion to strike untimely response on July 29, along with a proposed order.  The trial court denied those motions to strike by written interlocutory order on July 30.  A third motion to strike the exception of prematurity was filed on August 29, along with one of the requests for default.  The trial court orally denied the motion to strike at the September 2 hearing and issued a written denial the same day.  Option Care points out that the trial court specifically noted that its sustaining of the

12

exception of prematurity rendered the additional dilatory exceptions, and any oppositions thereto, moot.

There was no pending motion to strike the exception of prematurity, since it was sustained by the trial court on October 14, 2025. A review of the record indicates that Mrs. Crow's August 18 motion did indeed pertain to Option Care's exception of nonconformity, vagueness, and ambiguity, which was rendered moot by the court's previous sustaining of the exception of prematurity.

### *Merits of Exception of Prematurity – Application of the LMMA*

Mrs. Crow argues that, even if Option Care's exception was timely, it was substantively without merit, because the exception's assertion that she was required to submit a claim to a medical review panel under the LMMA before filing suit was incorrect given the nature of the conduct at issue. She alleges that the conduct underlying her claim is not a question of professional judgment or standard care for a malpractice action, but sounds in fraud and intentional conduct, such that the LMMA would not apply. She claims, therefore, that the panel process would not be required and the exception of prematurity has no foundation, pointing to a case she referred to as "*Dupuy v. NMC Operating Co.*, 15-0156 (La. App. 1 Cir. 11/9/15), 182 So. 3d 69."

Option Care claims that it fully argued all relevant subject matter in its exception of prematurity, including the factors in *Coleman v. Deno*, 01-1517 (La. 1/25/02), 813 So. 2d 303, regarding the claim sounding in malpractice rather than an intentional tort, and the trial court agreed with the analysis when ruling in its favor and sustaining the exception. It argues that Mrs.

Crow failed to raise any substantive argument against the factual and legal analysis presented in the exception of prematurity in support of her allegations that the case sounded in intentional tort, but she merely pointed to alleged facts she believes support an intentional tort in her brief – essentially that the pharmacist unilaterally increased the prescription dosage, and Option Care misidentified the prescribing physician. Option Care points out that Mrs. Crow actually produced multiple records that prove the increase in dosage was ordered by Dr. Malek. In addition, the misidentification of the prescriber was found by the Louisiana Board of Pharmacy to be simply human error. Option Care also asserts that Mrs. Crow never claimed that there was an identifiable causal relationship between the misidentified prescriber and the alleged overdose.

First, this Court did not find the *Dupuy* case by the citation referenced by Mrs. Crow, but instead reviewed *Dupuy v. NMC Operating Co., L.L.C.*, 15-1754 (La. 3/15/16), 187 So. 3d 436, presumably what Mrs. Crow intended to cite. In this case, the Louisiana Supreme Court actually reversed the district court's denial of an exception of prematurity, finding that the plaintiff's claims fell within the LMMA and should have been submitted to the medical review panel, following an application of the *Coleman* factors.

There is nothing in the record to support the Crows' intentional tort or fraud allegations. In fact, the evidence presented by Mrs. Crow fails to support the allegation of an incorrect dosage at all. Mrs. Crow submitted a photograph of the label of a syringe containing 500mg of Daptomycin dated June 30, 2024, but there is no way to know whether the syringe was the primary 500 mg dosage or an incorrect supplemental dosage. In any event,

14

according to Mrs. Crow, she stopped administering the medicine to Mr. Crow as of June 23, so whatever dosage was indicated on any syringes dated June 30 would be irrelevant. Mrs. Crow also submitted a photograph of what appears to be the package label for the supplemental syringe (not the syringe label itself) in which the initial description of the dosage was typed as 500 mg, but was marked through and handwritten as 250 mg. This would appear to indicate that the correct, lower supplemental dosage of 250 mg was shipped.

It is also clear from the record that the increased dosage was indeed prescribed by a physician, Dr. Malek, and there was no unilateral, unauthorized prescription by the pharmacist. The only mistake made by the pharmacy which is supported by the record is the incorrect physician identification, and there is no evidence of any causal relationship of the misidentification with any alleged overdose.

It does appear from Mr. Crow's medical records and lab results that he may have had an adverse reaction to the antibiotics he was receiving, specifically from an increase in the Daptomycin. However, not only is there a lack of evidence to show there was *any* mistaken dosage increase of 500 mg instead of 250 mg, but there is no evidence to support that Mr. Crow's condition was the result of that alleged incorrect dosage increase.

The Crows' claims, as supported by the record versus merely alleged in the pleadings, clearly sound in medical malpractice rather than intentional tort and/or fraud. Therefore, such claims should have been presented to a medical review panel per the requirements of the LMMA. The trial court was correct in sustaining Option Care's exception of prematurity.

15

## CONCLUSION

For the foregoing reasons, we AFFIRM the trial court's sustaining of Option Care's exception of prematurity and its judgment dismissing the Crows' case without prejudice. All costs of this proceeding are assessed to the Crows.

**AFFIRMED.**